

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable G. P. Lockhart, Chairman
Board of Insurance Commissioners
Austin, Texas

Dear Sir:

Opinion No. O-5751
Re: Are the withdrawn for-
eign life, accident,
and health insurance
companies in question
liable for the gross
premium tax on health
and accident premiums
collected from citizens
of Texas after said com-
panies withdrew from
Texas.

Your request for an opinion on the above matters
has been received and carefully considered. We quote
said request as follows:

"Please see our letter of July 12 and your
Opinion No. O-5438 of September 21 in response,
relating to the liability of withdrawn foreign
life insurance companies for payment of gross
receipts tax.

"Many of the companies before withdrawal
were authorized to and did write accident and
health policies on Texas citizens in addition
to life policies; some wrote only health or ac-
cident policies or both.

"Please advise me whether under Article
7064 such companies are also liable for the
gross premium tax on health and accident pre-
miums collected from citizens of Texas after
the company withdrew.

Honorable O. P. Lockhart, Page 2

"Please advise me as to who are citizens
of this State as contemplated by the Articles
discussed in your opinion in the following
factual situations, or variations of them now
before us:

"1. The policyholder is a Texas citi-
zen at date of purchase of the policy but
later removes his residence and citizenship
to another state, where he continues his re-
newal premium payments.

"2. The policyholder is a citizen of
another state at date of purchase of the
policy but later removes his residence and
citizenship to Texas, where he continues his
renewal premium payments."

Article 7064, Vernon's Annotated Revised Civil
Statutes of Texas of 1925, as amended by the Acts of the
47th Legislature in 1941, provides that:

"Article 7064. Every insurance corporation,
Lloyd's or reciprocals, and any other organiza-
tion or concern transacting the business of fire,
marine, marine inland, accident, credit, title,
livestock, fidelity, guaranty, surety, casualty,
or any other kind or character of insurance
business other than the business of life insur-
ance, and other than fraternal benefit associa-
tions, within this State at the time of filing
its annual statement, shall report to the Board
of Insurance Commissioners the gross amount of
premiums received upon property located in this
State or on risks located in this State dur-
ing the preceding year, and each of such in-
surance carriers shall pay an annual tax upon
such gross premium receipts as follows: shall
pay a tax of four and five hundredths (4.05)
per cent, provided that any such insurance
carriers doing two (2) or more kinds of insur-
ance business herein referred to shall pay the
tax herein levied upon its gross premiums
received from each of said kinds of business;

Honorable C. P. Lockhart, Page 3

and the gross premium receipts where re-
ferred to in this law shall be the total
gross amount of premiums received on each
and every kind of insurance or risk written,
except premiums received from other licensed
companies for reinsurance, less return pre-
miums and dividends paid policyholders, but
thereshall be no deduction for premiums paid
for reinsurance. The gross premium receipts,
as above defined, shall be reported and shown
as the premium receipts in the report to the
Board of Insurance Commissioners by the in-
surance carriers, upon the sworn statements
of two (2) principal officers of such car-
riers. Upon receipt by the Board of In-
surance Commissioners of the sworn state-
ments, showing the gross premium receipts
by such insurance carriers, the Board of
Insurance Commissioners shall certify to
the State Treasurer the amount of taxes due
by each insurance carrier, which tax shall
be paid to the State Treasurer on or before
the lst of March following, and the Treasurer
shall issue his receipt to such carrier,
which shall be evidence of the payment of
such taxes. . . . . "

Whether or not foreign insurance companies col-
lecting premiums from health and accident insurance in
Texas after they have withdrawn therefrom are liable
for the payment of the gross premium tax provided for
by the above provision of the Statutes of Texas will de-
pend upon whether or not the collection of such premiums
constitutes "transacting the business of accident and
health insurance within this State".

A similar question was involved in the case of
Connecticut Mutual Life Insurance Company Vs. Spratley,
172 U. S. 602, 19 Supreme Court, 308, 43 L. Ed. 569. Said
life insurance company had done business in the State of
Tennessee over a period of years, and during that time it
had issued the policy involved in said suit. After issuing
said policy and many others, it ceased issuing any new
policies in said state and withdrew its general agents
from the State and notified the State Insurance Commission
to that effect, but it did continue to receive its premiums
on the policies that were issued by it, including the one
involved in said suit issued to Mr. Spratley. In passing

Honorable C. P. Lockhart, Page 4

upon whether or not the insurance company was doing business in the State in continuing to collect premiums after it had withdrawn from the State on the policies issued by it before it withdrew, the Supreme Court of the United States made the following holding:

"It cannot be said with truth, as we think, that an insurance company does no business within a state unless it have agents therein who are continuously seeking new risks and it is continuing to issue new policies upon such risks. Having succeeded in taking risks in the state through a number of years, it cannot be said to cease doing business therein when it ceases to obtain or ask for new risks or to issue new policies, while at the same time its old policies continue in force and the premiums thereon are continuously paid by the policy holder to an agent residing in another state, and who was once the agent in the state where the policy holders resided. This action on the part of the company constitutes doing business within the state so far as is necessary, within the meaning of the law upon this subject."

This principle of law was approved by the United States District Court of the Northern District of Texas in the case of Hegler, et al, Vs. Security Mutual Life Insurance Company, 244 Fed. 863, which involved the question of whether a foreign life insurance company was still doing business in Texas after it had withdrawn from the State by continuing to collect premiums on the policies outstanding at the time it withdrew, and the court held as follows thereon:

"(3) Notwithstanding the defendant withdrew from business so far as writing new policies was concerned, it continued to collect premiums on the policies outstanding. The number of policies in force the last of the year 1907 was 1,143, and the amount of insurance, $2,649,606, and the number of policies still outstanding October 1, 1915, was 682,

Honorable O. P. Lockhart, Page 5

> and the amount of insurance $1,399,114.
> The premiums on this amount of insurance
> were a substantial amount, and their col-
> lection constituted doing business within
> the State."

These holdings were again affirmed in Mutual
Reserve Fund Life Association Vs. Phelps, 190 U. S.
147, 23 Sup. Ct. 707, 47 L. Ed. 987; Mutual Reserve
Life Insurance Company Vs. Birch, 200 U. S. 612,
26 Sup. Ct. 752, 50 L. Ed. 620; Commercial Mutual Ac-
cident Company Vs. Davis, 213 U. S. 245, 29 Sup. Ct.
445, 53 L. Ed. 782.

In view of these holdings, it is our opinion
that so continuing to collect said premiums does
constitute the transaction of insurance business
within this State so as to make said companies liable
for the gross receipt taxes provided for by said
Article 7064 under the various rates provided for
therein from the time said law was first passed by
the First Called Session of the 30th Legislature in
1907, Page 479 of the Acts of the Regular Session of
said Legislature. A similar provision is found in
all of the amendments thereof, but different rates
have been assessed over different periods of time.

The general principles of law referred to
in our Opinion Number O-5438 as being applicable to
foreign life insurance companies insofar as they deal
with the right of the State to impose conditions
upon such companies when they enter Texas in order
to do an insurance business therein are also ap-
plicable to foreign accident and health insurance
companies that enter this State for the purpose of
doing business herein, and such companies will be
presumed to have accepted all conditions imposed
upon them by the laws of this State and will be
bound thereby.

Honorable C. P. Lockhart, Page 6

State citizenship is governed by that part of the provisions of the United States Constitution, Amendment 14, Section 1, which reads as follows:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. . . "

State citizenship, therefore, depends upon residence. The term "reside" has reference to the "domicile" or "legal residence" of the person, a statement of the distinction between actual residence and domicile having been quoted with approval by our Supreme Court in the case of Pecos & N. T. Ry. Co., et al, v. Thompson, 167 S. W. 801, as follows:

"'Residence' means living in a particular locality, but 'domicile' means living in that locality with the intent to make it a fixed and permanent home. Residence simply requires bodily presence as an inhabitant in a given place, while domicile requires bodily presence in that place, and also an intention to make it one's domicile." Flatauer v. Loser, 156 App. Div. 591, 141 N. Y. Supp. 953; In re Newcomb, 192 N. Y. 238, 84 N. E. 950.

In the case of Chicago and Northwestern Ry. Co. v. Ohle, 117 U. S. 123, 6 Sup. Ct. 632, 29 Law Edition, 837, the Supreme Court of the United States was dealing with the right of a party to bring a suit in a federal court in Illinois within a few weeks after he had moved into said state, and the court held that the only question was whether he had actually and in good faith given up his former citizenship and acquired a new citizenship in Illinois before the suit was brought, and the following charge was approved as having been a correct statement of the law:

"12. Now the point that you are to decide, gentlemen, is this: did the plaintiff, Gus. B. Ohle, at any time leave the State of Iowa for the purpose of taking up, actually and in good faith, his residence and citizenship in Illinois? Now, I use the word residence

Honorable O. P. Lockhart, Page 7

meaning this: it would not be sufficient merely to show that he went and resided in the sense of living in Illinois. Residence is evidence of the citizenship. You are ultimately to find whether he became a citizen of Illinois. In deciding that question you have a right to consider what he did in the matter of residence; that is, where he actually lived; the place he occupied, what we ordinarily mean by the term 'living.' Now, it is claimed on the part of Ohle that he went to Chicago in November, 1883; that it was his intent to remove to the State of Illinois, and with the purpose of completing his education by going through this school at Janesville, and then pursuing his vocation in life in the State of Illinois. Now, if he did in good faith leave the State of Iowa, give up the citizenship here, going to Chicago, Illinois, with the idea of taking up his citizenship there, did actually do that in good faith, although he may at that time have had it in his mind, and he did actually go to Janesville to complete his education, that would not defeat his acquiring his citizenship in the State of Illinois at the time he actually went there in November; provided you find, remember, gentlemen, that he had the intent at that time, bona fide, actual intent of settling in Illinois. Now, you are to determine this, under the evidence that has been submitted to you; you are to determine whether at that time, he then had the honest intent of changing his residence. If he did, and he went over there with that purpose, with that intent, and remained in Chicago for whatever time the evidence shows, some two or three weeks, it is for you to determine the question as to that. If that was his object and intent it would justify you in finding that he had acquired a citizenship there. The fact that he then went to Janesville to complete his education would no more defeat his citizenship in Illinois than it would defeat his citizenship in Iowa if he had still retained that citizenship.

"It then remains for you to determine the object and intent that he then had.

Honorable C. P. Lockhart, Page 8

"13. Now, it is contended on the part of the defendant that he did not acquire citizenship in Chicago until he went there in March, 1884, after he had completed his schooling in Janesville. Now, if he did not, if that was the first time that he actually went to Chicago with the intent to remain there and take up his citizenship and his residence there, why then you would have to find that that was the time that he lost his citizenship in Iowa and acquired it in Illinois. Therefore, as I say, the question is what was his intent. By way of illustration: if when he went to the City of Chicago in November, 1883, his object and purpose was simply to go through Chicago to Janesville to complete his education, with the intention, some time in the future, after he had completed his education of going back to Illinois, then he would not acquire his citizenship until he actually went there; but if, when he went in 1883, he went with the intention of actually changing his residence and acquiring a citizenship in Chicago, Illinois, then, if you find that to be the fact you are justified in finding that at the time he changed his citizenship within the meaning of the questions involved in this case."

In the case of Morris Vs. Gilmer, 129 U. S. 315, 9 Sup. Ct. 289, 32 Law Ed. 690, said court made the following statement as to state citizenship:

"It is true, as contended by the defendant, that a citizen of the United States can instantly transfer his citizenship from one State to another (Cooper v. Galbraith, 3 Wash. C. C. 546, 554), and that his right to sue in the courts of the United States is none the less because his change of domicile was induced by the purpose, whether avowed or not, of invoking, for the protection of his rights, the jurisdiction of a federal court. As said by Mr. Justice Story, in Briggs v. French, 2 Sumn. 251, 256, 'If the new citizenship is really and truly acquired, his right to sue is a legitimate, constitutional, and legal consequence, not to be impeached by the motive of his removal.'

Honorable O. P. Lockhart, Page 9

> Manhattan L. Ins. Co. v. Broughton, 109
> U. S. 121, 125 (27:878, 880); Jones v.
> League, 59 U. S. 18 How. 76, 81 (15:263,
> 264). There must be an actual, not pretended,
> change of domicile; in other words, the re-
> moval must be 'a real one, animo manendi, and
> not merely ostensible.' Case v. Clarke,
> 5 concur in order to effect such a change of
> domicile as constitutes a change of citizen-
> ship. In Ennis v. Smith, 55 U. S. 14 How.
> 400,423 (14:472) it was said that 'A re-
> moval which does not contemplate an absence
> from the former domicile for an indefinite
> and uncertain time is not a change of it,'
> and that while it was difficult to lay down
> any rule under which every instance of
> residence could be brought which may make a
> domicile of choice, 'there must be, to
> constitute it, actual residence in the place
> with the intention that it is to be a princi-
> pal and permanent residence.'"

In the case of Mid-Continent Pipeline Co. v.
Whiteley, 116 Fed. 2nd, 871, the Circuit Court of Ap-
peals for the tenth circuit had before it the question
of whether or not plaintiff has abandoned his residence
in Oklahoma and established residence in California at
the time he brought the suit in question, the facts show-
ing the suit was instituted in California on February
6, 1939, and that he had left Oklahoma in December, 1938.
The Court held that, if plaintiff went to California in
December, 1938, with a present intention and purpose
of remaining and establishing his residence there, he
thereupon became and was at the institution of the suit
a citizen of that state, within the meaning of the first
paragraph of Section 24 of the Judicial Code, as amended,
28 U. S. C. A., Section 41, which provides for suit in
federal court where there is diversity of citizenship.

Therefore, as contemplated by the articles dis-
cussed in our Opinion Number O-5438, where the policy-
holder is a Texas citizen at the date of the purchase of
the policy, but later removes his residence and citizen-
ship to another state in accordance with the rules of law
above referred to where he continues his renewal payments,

Honorable C. P. Lockhart, Page 10

such payments would not be subject to payment of the gross premium tax as referred to in said opinion.

Where the policyholder is a citizen of another state at the date of the purchase of a policy, but later removes his residence and citizenship to Texas in accordance with said rules of law where he continues his renewal premium payments, such payments would be subject to said gross premium tax.

We direct your attention, however, to the fact that there is a difference in the provisions of the statutes fixing gross receipts taxes on the premiums collected by foreign life insurance companies and those collected by foreign accident and health insurance companies, in that the former is based upon premiums collected from citizens of this State (Articles 4769 and 4772), and the latter is based upon the gross amount of premiums received upon risks located in this state (Article 7064).

Trusting that this satisfactorily answers your inquiry, we remain

Very truly yours

ATTORNEY GENERAL OF TEXAS

APPROVED JAN 15, 1944

ATTORNEY GENERAL OF TEXAS

By James W. Bassett
James W. Bassett
Assistant

JWB:vde